ORIGINAL




E-filing

COURTNEY E. VAUDREUIL (SBN 223439)
cvaudreuil@mckennalong.com
MCKENNA LONG & ALDRIDGE LLP
300 South Grand Avenue, 14th Floor
Los Angeles, CA 90071-3124
Telephone: (213) 688-1000
Facsimile: (213) 243-6330

Attorney for Plaintiff
ANIMAL LEGAL DEFENSE FUND

MATTHEW STRUGAR (State Bar No. 232951)
Matthew-S@petaf.org
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
Tel: 323-210-2263
Fax: 202-540-2207

KATHERINE A. MEYER (*pro hac vice* pending)
katherinemeyer@meyerglitz.com
MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Avenue N.W., Suite 700
Washington, D.C. 20009
Telephone: (202) 588-5206
Facsimile: (202) 588-5049

Attorneys for Plaintiffs
ANIMAL LEGAL DEFENSE FUND, ORCA NETWORK; PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.; HOWARD GARRETT; SHELBY PROIE; PATRICIA SYKES; KAREN MUNRO

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND, ORCA NETWORK, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.; HOWARD GARRETT; SHELBY PROIE; PATRICIA SYKES; KAREN MUNRO,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE; TOM VILSACK, in his official capacity as Secretary of the United States Department of Agriculture; and ELIZABETH | CASE NO. CV 12 4407<br><br>Assigned to:<br><br>Referred to:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** KAW<br><br>Administrative Procedure Act Case |

GOLDENTYER, in her official capacity as Eastern Regional Director of the United States Department of Agriculture Animal and Plant Health Inspection Service,

Defendants.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. Plaintiffs challenge a decision by the United States Department of Agriculture ("USDA") to renew the license of the Marine Exhibition Corporation d/b/a Miami Seaquarium ("Seaquarium") under the Animal Welfare Act ("AWA"), 7 U.S.C. §§ 2131-2159 (2012). USDA's internal documents demonstrate that Seaquarium is in violation of the "minimum standards" promulgated by the agency under the AWA, which are intended to ensure that *Orcinus orca* ("orcas") used in exhibition "are provided humane care and treatment." 7 U.S.C. § 2131(1). The AWA provides that "*no such license shall be issued* until the . . . exhibitor *shall have demonstrated that his facilities comply*" with such standards. Id. § 2133 (emphasis added). For years, Seaquarium has housed an orca named Lolita under conditions that violate the agency's standards. Lolita is kept in a tank so small that it fails to meet the minimum size requirements. She is denied the ability to shield herself from the burning sun. She is also not provided the company of a compatible animal of the same or a biologically related species. Moreover, the Seaquarium has also failed to establish, as required, written contingency plans regarding emergency sources of water and electric power in the event of failure of the primary sources, when such failure could reasonably be expected to be detrimental to the health and well-being of Lolita and the other the marine mammals housed in the facility. USDA's persistent failure to ensure the humane treatment of Lolita and recent renewal of Seaquarium's license violates the AWA and is arbitrary and capricious, an abuse of discretion, and not in accordance with law within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2). The agency's pattern and practice of perfunctorily renewing Seaquarium's AWA license each year, despite the facility's flagrant violations of the applicable AWA standards, also violates the AWA,

is arbitrary and capricious, an abuse of discretion, and not in accordance with law within the meaning of the APA.

**JURISDICTION AND VENUE**

2. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361, as this action constitutes a case and controversy under the AWA, 7 U.S.C. §§ 2131-2159, and the APA, 5 U.S.C. §§ 551-801, and applicable statutes, regulations, and policies.

3. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

4. Injunctive relief is authorized by Federal Rule of Civil Procedure 65, and the APA, 5 U.S.C. § 706.

5. Venue is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1391(e).

**PARTIES**

**PLAINTIFFS:**

6. Plaintiff Animal Legal Defense Fund ("ALDF") is a non-profit corporation based in Cotati, California, with more than one hundred and ten thousand members and supporters. For more than three decades, ALDF has fought to protect the lives and advance the interests of animals through the legal system. ALDF brings this action on its own behalf and on behalf of its members.

7. ALDF spends substantial resources each year advocating on behalf of animals used for exhibition and entertainment. ALDF files lawsuits and administrative petitions, including filings directly related to Seaquarium and Lolita, and spends resources educating the public regarding the unlawful and inhumane conditions in which Lolita is kept. ALDF also maintains an active website for its members and the general public, and it uses its website, publications, and the media to disseminate information to its members and the public about government actions affecting animals, including information about the treatment and lack of government protection of Lolita.

8. USDA's unlawful action in renewing Seaquarium's license injures ALDF because it means that ALDF must continue to spend resources monitoring Lolita's treatment and

maintenance, educating the public about the unlawful and inhumane conditions in which she is kept, and petitioning federal authorities to apply the laws that regulate her captivity.

9. ALDF's injuries are a direct result of USDA's decision to permit Seaquarium to continue to house Lolita under conditions that violate the AWA and are inhumane. These injuries will be redressed if ALDF prevails in this action because it will no longer have to spend as many resources monitoring this situation, educating the public about the unlawful and inhumane conditions in which Lolita is kept and USDA's failure to comply with the AWA, and advocating that USDA enforce the provisions of the AWA and deny issuance of a license to Seaquarium. ALDF's resources could then be spent on other projects, including efforts to protect and conserve whales and other animals, in furtherance of its overall mission.

10. ALDF also has members who have aesthetic interests in Lolita—they have seen her in captivity, have grown fond of her, and are aesthetically harmed by seeing her confined to a small tank with no ability to shield herself from the sun and with no companions of her own or a biologically related species. These members' aesthetic and emotional interests are harmed by USDA's decision to renew Seaquarium's license, which allows Seaquarium to continue treating Lolita inhumanely.

11. ALDF's members' emotional and aesthetic interests will be redressed if ALDF prevails in this case because Seaquarium would not be able to maintain a license under the AWA to exhibit Lolita without improving her conditions, which means that it would either have to provide Lolita with a larger living space, shelter from the sun, and companions of her own species, or, if unable to improve her conditions in compliance with the AWA, ensure that she was placed in a different environment that is humane and consistent with the law. In either event, ALDF's members who have emotional and aesthetic interests in Lolita could visit her and enjoy her under much more humane conditions, which they would do as often as possible.

12. Plaintiff People for the Ethical Treatment of Animals ("PETA") is a non-profit organization headquartered in Norfolk, Virginia, that is dedicated to protecting animals from abuse, neglect, and cruelty, and undertakes these efforts through public education, cruelty investigations, research, animal rescue, legislation, special events, celebrity involvement, protest

campaigns, and lawsuits to enforce laws enacted to protect animals. PETA brings this case on its own behalf and on behalf of its members.

13. As part of its organizational activities, PETA has been required to expend resources educating the public about the unlawful and inhumane conditions under which Lolita has been kept for years at Seaquarium. PETA has also spent resources urging USDA to comply with the AWA by not issuing a license to Seaquarium, because Seaquarium is in violation of the AWA and the standards that apply with respect to its housing and care of Lolita. PETA has been required to expend its resources as a direct result of USDA's failure to comply with the AWA by renewing Seaquarium's license, thereby permitting Seaquarium to maintain Lolita in unlawful and inhumane conditions despite its failure to comply with the requirements for her housing and care.

14. If it prevails in this action, PETA will no longer have to expend as many resources educating the public about the unlawful and inhumane conditions in which Lolita is kept and USDA's failure to comply with the AWA. Those resources would then be directed to other PETA projects, including efforts to protect marine mammals and other animals, in furtherance of its overall mission.

15. PETA also has members who have aesthetic interests in Lolita – they have seen her in captivity, have grown fond of her, and are aesthetically harmed by seeing her confined to a small tank with no ability to shield herself from the sun and with no companions of her own or a biologically related species. These members' aesthetic and emotional interests are harmed by USDA's decision to renew Seaquarium's license, which allows Seaquarium to continue treating Lolita inhumanely and in turn causes PETA members aesthetic injury and emotional distress.

16. PETA's members' emotional and aesthetic interests will be redressed if PETA prevails in this case because Seaquarium would not be able to maintain a license under the AWA with regard to its exhibition Lolita without improving her conditions. Seaquarium would either have to provide Lolita with a larger living space, shelter from the sun, and companions of her own species, or, if unable to improve her conditions in compliance with the AWA, ensure that she was placed in a different environment that is humane and consistent with the law. In either event,

PETA's members who have emotional and aesthetic interests in Lolita could visit her and enjoy her under much more humane conditions, which they would do as often as possible.

17. Plaintiff Orca Network is a non-profit organization located in Greenbank, Washington, and dedicated to raising awareness of the whales of the Pacific Northwest and the importance of providing them healthy and safe habitats. For years, Orca Network has tracked and documented the activities of the L pod of the Southern Resident Killer Whale population—the pod from which Lolita was captured.

18. Orca Network has devoted a great deal of time and money to educate the public about Lolita's mistreatment by Seaquarium and to correct the public misimpression that she is being treated humanely, caused in part by USDA's improper sanction of the conditions in which she is kept. These resources could be spent on other projects of the organization in its efforts to protect and conserve whales.

19. Orca Network's director, Plaintiff Howard Garrett, delivers numerous presentations about the natural history of the L pod and other members of Lolita's extended family for conferences, school groups, and civic organizations throughout the year, each time describing the capture operations that removed Lolita from her family, the isolated and cramped conditions in which she is being held by Seaquarium, and the safe and logistical feasibility of returning her to be cared for in her natural habitat.

20. This drain on resources of Orca Network is caused by USDA's decision to allow Seaquarium to continue to maintain Lolita in inhumane conditions that violate the AWA and the statute's implementing regulations. These resource injuries will be redressed if USDA's decision to renew Seaquarium's license is set aside and Lolita is required to be treated humanely.

21. Plaintiff Howard Garrett lives in Greenbank, Washington, and is the director of Orca Network. For many years he has studied orcas and receives much aesthetic pleasure from studying and observing the Southern Resident orca population and the L pod.

22. Because of his devotion to these whales, Mr. Garrett has followed the plight of Lolita for years. In 1993, he attended a conference on whale conservation in Florida and went to visit Lolita at Seaquarium. When he was able to see her in person, he developed an even stronger

personal bond with her, which only increased his desire to help improve her life. However, Mr. Garrett suffered great aesthetic harm and emotional distress from viewing Lolita in her substandard tank, no companions of her own or a biologically related species, and no ability to shield herself from the ultraviolet rays of the hot Miami sun. Since his initial visit, he has been back to see Lolita on several occasions, and each time is pained by seeing her continue to languish in these inhumane conditions. He has been in contact with many others who have seen and monitored Lolita and who, knowing of his devotion to her, send him reports, photographs, and videotape of her, and he also follows and contributes to social media websites that discuss her plight.

23. For years, Mr. Garrett has submitted voluminous materials to both Seaquarium and the federal government, including USDA, in an effort to obtain more humane treatment for Lolita, but has been unable to obtain any such relief. He would very much like to visit Lolita to maintain and enjoy his personal relationship with her, but is aesthetically harmed whenever he does so because it causes him great pain and anguish to see her in such inhumane conditions. He also does not want to give Seaquarium any money for the cost of a ticket to see Lolita because he does not want to provide financial support to the facility that continues to maintain her in such inhumane conditions. Consequently, he is faced with the choice of having to visit Lolita at Seaquarium and be distressed from seeing her subjected to such conditions, or to refrain from visiting her to avoid such injuries and contributing monetarily to the very facility that is causing her suffering—both of which cause him additional emotional injury.

24. Mr. Garrett's aesthetic and emotional injuries are caused by USDA's decision to allow Seaquarium to maintain Lolita in inhumane conditions in violation of the AWA, including keeping her in a small concrete tank without shelter from the sun, enrichment, and companions of her own or a biologically related species.

25. Mr. Garrett's professional, educational, and aesthetic interests will be redressed if USDA's decision to allow Seaquarium to maintain Lolita in inhumane conditions is set aside, because Seaquarium will either have to improve her living conditions as required by the AWA or ensure that she is sent somewhere else that can humanely care for her. If Lolita were placed in

humane conditions, Mr. Garrett would visit her as often as possible. If she were returned to a seaside sanctuary in her native waters, he would do everything possible to help assist in her reintroduction to the L pod, would visit her often, and continue to study, photograph, observe, and otherwise enjoy her and the rest of her family.

26. Plaintiff Shelby Proie lives in Seattle, Washington. For many years Ms. Proie has spent time studying and observing Lolita and monitoring the conditions under which she lives. Ms. Proie has observed and photographed Lolita many times in captivity and has formed a strong emotional bond with her. She has submitted materials to both Seaquarium and USDA in an effort to obtain more humane treatment for Lolita, but she has been unable to obtain any such relief. She would very much like to continue to visit Lolita to maintain and enjoy her personal relationship with her, but is aesthetically harmed whenever she does so because it causes her great pain and anguish to see Lolita in such inhumane conditions. She also does not want to give Seaquarium any money for the cost of a ticket to see Lolita because she does not want to provide financial support to the facility that continues to maintain Lolita in such inhumane conditions.

27. Ms. Proie is aesthetically and emotionally injured by having to make the choice between paying Seaquarium money to visit Lolita in inhumane conditions and refraining from visiting Lolita, with whom she has formed a strong emotional bond. All of these injuries are caused by USDA's decision to allow Seaquarium to exhibit Lolita in unlawful and inhumane conditions.

28. Ms. Proie's educational and aesthetic interests will be redressed if she prevails in this action because Seaquarium will not be able to maintain a license under the AWA with regard to its exhibition of Lolita without improving her conditions. Seaquarium will either have to provide Lolita with a larger living space, shelter from the sun, and companions of her own or a biologically related species, or, if it is unable to improve her conditions in compliance with the AWA, it will have to ensure that she is placed in a different environment that is humane and consistent with the law. In either event, Ms. Proie could visit Lolita and enjoy her under lawful and humane conditions, which she would do as often as possible.

29. Plaintiff Patricia Sykes lives in Denver, Colorado. She was employed at Seaquarium in 1970 when Lolita was captured from the wild and brought there to be trained to perform tricks for an audience. She was part of the staff assigned to attempt to acclimate Lolita to a life in captivity. Ms. Sykes personally observed Lolita endure great suffering during this time and for many years later, having been torn from her family and forced to live in a small tank in unnatural conditions, including with excess exposure to the sun. Ms. Sykes formed a strong emotional bond with Lolita and wants to do everything in her power to help Lolita secure a better life. Although Ms. Sykes continues to actively monitor Lolita's situation, through websites and other means, she can no longer bear to visit Lolita in her current situation without suffering great aesthetic and emotional harm. Ms. Sykes is emotionally injured by having to make the choice between paying Seaquarium money to visit Lolita in inhumane conditions and refraining from visiting Lolita with whom she has formed a strong emotional bond. These injuries are a direct result of USDA's decision to permit Seaquarium to maintain Lolita in unlawful and inhumane conditions.

30. Ms. Sykes's emotional and aesthetic interests will be redressed if Seaquarium is unable to maintain a license under the AWA with regard to its exhibition of Lolita without improving her conditions, which means that it would either have to provide Lolita with a larger living space, shelter from the sun, and companions of her own or a biologically related species, or, if unable to improve her conditions in compliance with the AWA, ensure that she was placed in a different environment that is humane and consistent with the law. In either event, Ms. Sykes could visit Lolita and enjoy her under lawful and humane conditions, which she would do as often as possible.

31. Plaintiff Karen Munro lives in Olympia, Washington. She has had an intense interest for over thirty-five years in protecting orcas, including those in the wild and in captivity. Ms. Munro has seen young orcas captured and torn from their families in the wild by the exhibition industry—an experience that continues to haunt her. As a result, Mr. Munro wants to protect wild orca populations from future violent captures and help orcas that have been removed from the wild, like Lolita, be reunited with their families. After observing orca captures, Ms.

Munro learned about and became dedicated to rescuing Lolita from the inhumane living conditions at Seaquarium. She has spent many hours of her life devoted to helping improve the conditions in which Lolita lives and has an intense interest in helping Lolita return to the wild Southern Resident killer whale population from which she was captured.

32. Over the years, Ms. Munro has helped organize protests in Miami concerning Lolita and has stayed closely informed about Lolita's condition and plight. She has read publications about Lolita, talked to many individuals with personal knowledge of Lolita's condition and the circumstances in which she is kept, and viewed videotape and photographs of Lolita. Through these experiences, and because of her personal experience in seeing young orcas of the Southern Resident killer whale population torn from their families, Ms. Munro has developed a strong emotional attachment to Lolita and wants to do everything in her power to help this orca. Ms. Munro would very much like to visit Lolita in person, but is unable to do so without suffering aesthetic and emotional injury from having to see Lolita in a small tank, without companions of her own or a biologically related species, and without the ability to shield herself from the hot Miami sun. Ms. Munro also does not want to contribute financially to Seaquarium, which maintains Lolita in these inhumane conditions. Ms. Munro would very much like to visit Lolita in a lawful and humane setting and will do so when she has that opportunity.

33. Ms. Monro's aesthetic interests in enjoying Lolita in a humane setting are impaired by USDA's decision to permit Seaquarium to continue to exhibit Lolita under unlawful and inhumane conditions.

34. Ms. Munro's aesthetic and emotional interests will be redressed if she prevails in this action because Seaquarium will not be able to maintain a license under the AWA with regard to its exhibition of Lolita without improving her conditions, which means that it would either have to provide Lolita with a larger living space, shelter from the sun, and companions of her own or a biologically related species, or, if unable to improve her conditions in compliance with the AWA, ensure that she was placed in a different environment that is humane and consistent with the law. In either event, Ms. Munro would visit and enjoy Lolita as often as possible.

**DEFENDANTS**

35. Defendant Tom Vilsack is the Secretary of USDA and responsible for administering the AWA and ensuring the humane care and treatment of animals that are used for exhibition, and hence is ultimately responsible for the decision to renew Seaquarium's license.

36. Defendant Elizabeth Goldentyer is the Eastern Regional Director for the USDA and the individual who made the decision to renew Seaquarium's license.

**STATUTES AND REGULATIONS**

37. Congress enacted the AWA in 1970 to "insure that animals intended for use in research facilities or for exhibition purposes or for use as pets are provided humane care and treatment." 7 U.S.C. § 2131(1).

38. To accomplish this goal, Congress directed the Secretary of Agriculture to promulgate standards for the "humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors." 7 U.S.C. § 2143(a)(1). These standards are required to include "*minimum* requirements for handling, housing, feeding, watering, sanitation, ventilation, shelter from extremes of weather and temperatures, [and] adequate veterinary care." Id. § 2143(a)(2)(A) (emphasis added).

39. The statute further provides that the Secretary "shall issue licenses" to dealers and exhibitors, but that "*no such license shall be issued until the dealer or exhibitor shall have demonstrated that his facilities comply with the standards* promulgated by the Secretary" pursuant to the Act. 7 U.S.C. § 2133 (emphasis added).

40. The implementing regulations provide that "[t]he failure of any person to comply with any provision of the Act, or any of the provisions of the regulations or standards" promulgated pursuant to the Act "shall constitute grounds for denial of the license." 9 C.F.R. § 2.1(e).

41. Seaquarium holds a Class C exhibitor license pursuant to 9 C.F.R. §§ 1.1 and 2.1.

42. The standards set forth in 9 C.F.R. §§ 3.100–3.118 provide specifications for the "humane handling, care, treatment, and transportation of marine mammals."

43. The "primary enclosure" for a marine mammal "must be constructed and maintained so that the animals contained within are provided sufficient space, both horizontally and vertically, to be able to make normal postural and social adjustments with adequate freedom of movement in or out of the water." 9 C.F.R. § 3.104(a).

44. A primary enclosure for a cetacean must be provided a pool of water that has a "minimum horizontal dimension (MHD) . . . two times the average adult length" of the species. 9 C.F.R. § 3.104(b).

45. The regulations define the MHD as "the diameter of a circular pool of water, or in the case of a square, rectangle, oblong, or other shape pool, the diameter of the largest circle that can be inserted within the confines of such a pool of water." 9 C.F.R. § 1.1.

46. Because the average length of an adult orca is 24 feet, 9 C.F.R. § 3.104, Table III, Lolita's tank must have a MHD of 48 feet.

47. The standards further provide that natural or artificial shelter "which is appropriate for the species concerned, when the local climactic conditions are taken into consideration, shall be provided for all marine mammals kept outdoors to afford them protection from the weather or from direct sunlight." 9 C.F.R. § 3.103(b).

48. The standards also require that marine mammals, if known to be "primarily social in the wild," "must be housed in their primary enclosure with at least one compatible animal of the same or biologically related species" unless the veterinarian believes it is not in the animal's best interest. 9 C.F.R. § 3.109.

49. The standards also provide that "[r]eliable and adequate sources of water and electric power must be provided by the facility," and that "[w]ritten contingency plans must be submitted to and approved by the Deputy Administrator regarding emergency sources of water and electric power in the event of failure of the primary sources, when such failure could reasonably be expected to be detrimental to the good health and well-being of the marine mammals housed in the facility." 9 C.F.R. § 3.101(b).

## FACTS GIVING RISE TO PLAINTIFFS' CLAIMS

***Background***

50. Orcas are large, long-lived, and socially and cognitively complex apex predators that depend highly upon social networks and communication for normal development.

51. Movement and travel in social groups is one of the most essential components of orca society, and orcas are known for their long distance travel. Individuals in the wild travel up to 100 miles per day, can occupy large ranges, and some populations migrate vast distances over many thousands of miles.

52. Orcas are not only gregarious, but form societies with dynamic social roles in intricate social networks with cultural traditions. Orca communities have distinct dialects and exhibit complex cooperative feeding strategies for a range of prey that are passed down through generations.

53. Consistent with their sophisticated behavior, the orca brain is among the largest and most complex of all mammals. The size of the brain relative to an orca's body is above average and the parts of the brain associated with sophisticated cognitive abilities are highly elaborated: the orca brain shows all the hallmarks of a brain that has undergone strong selection for the evolution of complex cognitive and social/emotional processes.

54. Orcas are capable of life history trajectories similar to human beings—they reach sexual maturity at approximately 14 years, males live an average of 30 and up to 50–60 years, and females live an average of 50 and up to over 100 years.

55. Orcas are highly vulnerable to psychological and physical harm in captivity and, like humans, suffer many of the same stress-related diseases.

56. In 1968, Seaquarium purchased an orca named Hugo who had been captured from the wild in the Puget Sound. Shortly thereafter, Seaquarium decided to add a second orca to its exhibition.

57. Lolita was captured on August 8, 1970, in Whidbey Island's Penn Cove, off the coast of Washington State. She was approximately 3–6 years old at the time and was a member of the L pod of the Southern Resident community.

58. Lolita was then purchased by Seaquarium, where she has been since September 24, 1970.

59. For more than 40 years, this approximately 20-foot long, 7,000 pound, wild-born animal has been forced to swim in circles in a concrete tank. In the wild, Lolita might swim as many as a hundred miles a day. Deprived of the experiences that wild orca enjoy, such as hunting, mating, communicating, and otherwise interacting with other members of her pod, Lolita is instead forced to perform tricks daily for Seaquarium customers.

60. For 10 years, Lolita and Hugo were held together in a tank at Seaquarium. Unfortunately, in March 1980, Hugo—who reportedly had a history of slamming into tank walls and once broke a glass viewing window and lacerated his rostrum—died. Since then, Lolita has been totally isolated from any other member of her species.

61. Lolita currently performs each day in the "Killer Whale and Dolphin Show" at Seaquarium.

62. Seaquarium is a for-profit corporation. It charges the public admission to see Lolita perform tricks.

63. Upon information and belief, Seaquarium has made tens of millions of dollars from displaying Lolita to the public.

***Lolita's Non-Compliant Tank***

64. Under the primary enclosure standard, cetaceans must be provided a pool of water that has a MHD that is "two times the average adult length" of the species. 9 C.F.R. §3.104(b). The average length of an orca whale is 24 feet, which means that Lolita's tank must have a MHD of 48 feet. Id. § 3.104, Table III.

65. Lolita's "primary enclosure," as that term is defined by 9 C.F.R. § 1.1, is an oblong-shaped tank, with a large, crescent-shaped concrete platform that extends from the bottom of the tank through the surface of the water and is used as a stage by Lolita's trainers during public performances.

66. The concrete platform in Lolita's enclosure is impassible under the water.

67. Lolita's tank measures approximately 80 feet by 60 feet and the concrete platform measures approximately 5 feet 2 inches wide in the middle of the tank, leaving unobstructed a space of only 80 feet by 35 feet. Therefore, the largest circular pool that could fit fully inside the tank without obstruction would measure only 35 feet across. USDA's own internal documents acknowledge that the MHD for Lolita's tank is only 35 feet and that the MHD is 60 feet only if the concrete obstruction is completely "disregarded." Lolita's tank at Seaquarium fails to meet this minimum requirement, even if the sole limited exception is applied. See id. § 3.104(b)(1)(i).

68. Allowing Seaquarium to keep Lolita in a tank that is smaller than the "minimum" standard set by the agency impairs Lolita's ability to engage in her natural behaviors and is inhumane.

***Lolita Lacks Adequate Shelter From Inclement Weather***

69. Lolita's tank also does not comply with the requirement of 9 C.F.R. § 3.103(b) that marine mammals kept outdoors be afforded protection from weather or direct sunlight. Lolita's tank is exposed to the hot Miami sun and provides no opportunity for Lolita to shield herself during the most intense heat of the day, when the sun is highest, hottest, and no shadows are cast in the tank.

70. Lolita is, thus, exposed to intense ultraviolet radiation as she floats around the surface of her tank. Rather than provide adequate shelter, Seaquarium applies black-colored zinc oxide as sunscreen to Lolita. The effects of the sunscreen on this wild animal's physiology, from the dermal absorption and from the contamination of the tank water, are unknown. Rather than potentially put Lolita at risk of further harm, the statutorily required solution is that Seaquarium provide Lolita with adequate cover from the sun.

71. Although Lolita's tank is surrounded by stadium seating that is covered for the comfort of Seaquarium's customers, the stadium covering does not extend over the tank.

72. In addition to sunburn and potential impacts from the application of sunscreen to a wild marine animal, exposure to ultraviolet radiation is a factor in the development of cataracts and retinal damage, and may also act as an immunosuppressant.

73. In the wild, orcas typically remain submerged and surface only to breathe and conduct aerial behaviors. They spend the majority of their lives submerged at depths that lessen the impacts of ultraviolet radiation. Because the tank is only 20 feet at its deepest point, Lolita is denied the opportunity to dive deeply to protect herself from the ultraviolet rays of the sun or to seek cover from a tropical storm—an event that occurs regularly in Florida.

74. Moreover, because the water in the tank is relatively clear, even if Lolita were able to rest at the bottom of the small and shallow tank, the lack of turbidity from dissolved organic matter means that ultraviolet radiation has fewer impediments to reach her.

75. These conditions are harmful to Lolita's physical condition, deprive her of the ability to engage in her natural behaviors, and are inhumane.

***Lolita's Isolation From Other Members Of Her Species***

76. Although orcas are "primarily social in the wild," within the meaning of 9 C.F.R. § 3.109, since 1980 Lolita has not been housed with any other orcas, as required by that standard.

77. Although Lolita is often housed with Pacific white-sided dolphins, these animals are not of the same species as Lolita and are also not "biologically related" to her, in that they are not able to provide her with the kind of social interaction and stimulation she needs for her health and well-being.

78. Orcas and Pacific white-sided dolphins do not normally interact in the wild.

79. Orcas and Pacific white-sided dolphins are no more biologically related than a human and a gorilla or chimpanzee. This is an inappropriate level of social interaction that cannot satisfy the social needs of either species.

80. Depriving Lolita of social companionship from members of her own or a biologically related species deprives her of the ability to engage in her natural behaviors, causes her much psychological damage, and is inhumane.

81. USDA does not have a written contingency plan for Seaquarium as required by 9 CFR 3.101(b).

***USDA's Renewal Of Seaquarium's License***

82. For years, USDA had been contacted by numerous groups and individuals who expressed concern about the conditions in which Lolita is kept, including her substandard tank, her exposure to the sun, and her lack of companionship with other orcas. Despite these complaints and evidence that the conditions in which Lolita is kept violate the minimum standards required by the AWA, USDA routinely and perfunctorily renews Seaquarium's license each year when it expires.

83. Prior to its license renewal, Seaquarium's most recent license was set to expire on April 21, 2012.

84. On February 16, 2012, Plaintiffs filed a lengthy and thorough submission with USDA urging it again not to renew Seaquarium's license when it expired, including a 17-page detailed recitation of how the conditions under which Lolita is kept violate the various AWA standards described above, and numerous exhibits, including USDA's own internal documents demonstrating that Seaquarium is currently in violation of these standards and has been for many years. The submission also included sworn declarations from world-leading cetacean experts and an expert in zoo design, which further detailed these violations and the physical and psychological harm that Lolita suffers as a result.

85. The submission explained that Seaquarium's exhibitor license should not be renewed, because: (1) Lolita's tank does not meet the minimum space requirements; (2) Seaquarium does not provide Lolita shelter from the sun and inclement weather, and (3) Lolita is not housed with marine mammals of her own species.

86. In a letter dated March 28, 2012, Defendant Goldentyer stated that despite Plaintiffs' submission the agency intended to renew Seaquarium's exhibitor license because it found that Seaquarium was in "compliance with the regulations and standards, and none of the other criteria for license denial under Section 2.11 or 2.12 are applicable."

87. On or about April 21, 2012, USDA renewed Seaquarium's license.

**PLAINTIFFS' CLAIMS FOR RELIEF**

**FIRST CLAIM: CHALLENGE TO APRIL 2012 LICENSE RENEWAL**

88. In renewing Seaquarium's license despite the facility's failure to comply with the AWA and its implementing regulations, Defendants acted in violation of the plain language of the AWA, and in a manner that is arbitrary and capricious, an abuse of discretion, and not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706(2)(A). The decision to renew exceeds USDA's statutory jurisdiction and authority, within the meaning of 5 U.S.C. § 706(2)(C).

89. USDA's unlawful actions injure Plaintiffs in the manner specified in the paragraphs of above.

**SECOND CLAIM: CHALLENGE TO AGENCY'S UNLAWFUL PATTERN AND PRACTICE**

90. USDA's pattern and practice of routinely renewing Seaquarium's AWA license each year when it expires, despite the facility's failure to comply with the AWA and its implementing regulations that apply to its exhibition of Lolita, violates the plain language of the AWA, and is arbitrary and capricious, an abuse of discretion, and not in accordance with law, within the meaning of the APA, 5 U.S.C. § 706(2)(A). The decision to renew annually also exceeds the USDA's statutory jurisdiction and authority, within the meaning of 5 U.S.C. § 706(2)(C).

91. USDA's unlawful actions injure Plaintiffs in the manner specified in the paragraphs of above.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that the Court:

1. Declare that Defendants acted arbitrarily and capriciously and not in accordance with law, abused their discretion, and exceeded their statutory jurisdiction and authority in (a) making the April 2012 decision to renew Seaquarium's exhibitor license; and (b) routinely renewing Seaquarium's AWA license each year.

2. Set aside as unlawful USDA's decision to renew Seaquarium's exhibitor license.

3. Award Plaintiffs their reasonable attorneys' fees and costs; and

4. Grant such other and further relief as the Court may deem just and proper.

Date: August 21, 2012

Respectfully submitted,

By: ______________________

Courtney E. Vaudreuil
MCKENNA LONG & ALDRIDGE LLP
300 South Grand Ave., Suite 1400
Los Angeles, CA 90071
(213) 243-6194

Attorneys for Plaintiff
ANIMAL LEGAL DEFENSE FUND

______________________

Matthew Strugar
PETA Foundation
2154 W. Sunset Blvd.
Los Angeles, CA 90026
(323) 210-2263

Attorneys for Plaintiffs
ORCA NETWORK; PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS; HOWARD GARRETT; SHELBY PROIE; PATRICIA SYKES; KAREN MUNRO